May it please the Court, good morning, Your Honors, David Strait for Plaintiff's Appellants. I respectfully request to reserve three minutes for rebuttal. Nine years ago this month, in April 2010, Facebook migrated tracking tools outside of the Facebook domain. More than 7 million websites integrate Facebook functionality, representing the majority of all web traffic. More than 30 billion times each day, Facebook's computer code on these websites causes browsers to quietly copy communications between Facebook subscribers and these websites  Because of the obvious privacy implications of such massive surveillance, implications raised by privacy advocates even before April 2010, Facebook assured its subscribers that it would only track them while logged into their accounts. Facebook assured the world that it was not attempting 24-7 web surveillance. Also on that very same day, Facebook updated its terms of use, contractually promising that its data collection practices would be disclosed in its privacy policy. But as a researcher in Australia would discover the following year, Facebook was secretly tracking its subscribers' intimate internet use, even when logged out of their accounts. With the benefit of discovery, much of which is under seal, we know it was no accident, and Facebook was aware that its practices were contrary to its public disclosures. Look, Counsel, these facts, of course, are in the briefs, and we have read those. Would you help me to start with, of course, we're primarily here because of Spokeo. The Supreme Court has changed the rules of it, and we're back in effect to a Lujan analysis. As you well described, prior to the time that Facebook surreptitiously took information from people, it had previously obtained their consent to obtain information. But when they went offline, they kept information that was not, if you will, permitted or disclosed. What injury did your clients suffer as a result of their tracking once the web activity stopped? In other words, they were giving permission in time period one. They did not give permission in time period two. But is it because something different was being picked up? And if so, where is that in the record? If it's the same, in what way are they damaged? Thank you. I appreciate that. Of course, we're here not only because of Spokeo, not only because of standing, but also because those claims where the district court found standing were also dismissed for other reasons. We're happy to address standing first. It's helpful to group our claims into four categories. There are three types of harm that were pled, two of which the district court accepted and one of which the court rejected. First would be loss of privacy. The second would be monetary damages. Let me just be clear. This is loss of privacy on a common law basis? Both common law, Your Honor, and statutory basis. Okay. There are four statutory claims, two under the ECPA. There's the Wiretap Act claim and then, of course, the SCA. And then there are two California analogs, Section 631 and 632. Those have statutory damages to compensate for loss of privacy. There are also two common law claims under California law, one of which is also in the California Constitution, and that would be intrusion upon seclusion and, of course, invasion of privacy. There are four additional claims for money damages, and there the basis for standing would be the right to seek monetary damages under California statutes. We have the statutory larceny. We have common law fraud, and we also have a Section 502 claim. There the monetary recovery would take the form of restitution or disgorgement of profits, both of which are recoverable damages under California law, so there would be money damages. So you're not claiming personal economic injury in the sense that your clients would have been willing to sell their privacy rights to someone else. Is that true? No, Your Honor. We should distinguish between the privacy damage and then the economic damage. Loss of privacy is an intangible harm. This is an intangible harm that is the preeminent tangible. No, I understand that theory. I just want to make sure I understand your economic theory. Yes, the economic theory. The economic theory is not based on the fact that your clients wanted to sell this information to somebody and were deprived of the opportunity, correct? Correct. It's the opposite. These plaintiffs wanted to keep their information private and were denied that right. So does the fact that Facebook sells this information and makes a lot of money from it, is that the condition precedent to your claim? In other words, they used your information illegally. They got money from it. It's yours. You're entitled to it. Is that basically the argument? No, that's one theory, Your Honor. Under the restatement, third restitution and unjust enrichment, and we have the benefit of the primary author of that book helping with us with an amicus brief here, there are two ways monetary damages could be calculated. One would be restitution. The other would be disgorgement. Under a restitution theory, the data that was stolen, the personally identifiable information, has value in the marketplace, and the fact that it was taken is compensable under a restitution theory. Alternatively, if Facebook monetized the data and earned unjust profits, that should be disgorge. The greater of those two would then be the measure of damages, either the value of the PII that was taken, regardless of whether used, or disgorgement of profits, meaning the profits that were earned. At the time we drafted the complaint, we were under the impression that this information was not shared with third parties. Instead, the information was put into your private digital dossier, and then Facebook would sell access to your eyeballs, essentially, to advertisers. Obviously, in the last year, we understand with the Cambridge Analytica scandal that maybe our assumptions were wrong in that, but that's not a part of this case. This is about the profits that Facebook earned on the stolen data, that would be disgorgement, or the mere fact of the stealing of the PII, which would be a restitution theory for the value of the PII, regardless of what profits were earned on it. Irrespective of the value of the PII, irrespective of any unjust profits, the primary claims in this case is, of course, loss of privacy. These are the same sort of claims that were allowed to proceed in the Google cookie placement case in the Third Circuit, and, of course, the later Nickelodeon Viacom case. Those cases, I believe, were post-Spokio, and they involved the loss of privacy, which the majority in Spokio agreed would be the precise type of intangible harm that can proceed, even absent loss of treasure. So in this case, the district court below agreed that loss of privacy is the type of intangible harm for which we can seek compensation. In the federal court, there is Article III standing. The district court also found standing to pursue nominal damages for the contract claim and for the breach of implied covenant of good faith and fair dealing. The district court disagreed with us on the standing to pursue the economic loss claims. Those were the three we have here, statutory larceny, fraud, Section 502. There was also a fourth claim, trespass to chattels, which is not here on appeal. But those claims were not allowed to proceed. The only analysis there was an Article III analysis. We respectfully ask for that portion of the decision to be reversed, but otherwise we do agree with the other two findings on standing. And no further questions on standing. I can go into the actual merits of the underlying claims, if that would be helpful, or do you have further questions on standing? Use your time as you want. Thank you, Your Honor. It's helpful, then, to go in the same order I just identified for standing, for the statutory claims, the wiretap claims, because there was independent analysis in the district court's order for dismissing the ECPA claims and a little bit of analysis on the California analogs. The district court below dismissed the wiretap claim on a theory of the party to the communication exception. Obviously, under the wiretap claim, if I communicate with you, there's no wiretap violation for the interception of that conversation because you're a party to the conversation. But the district court erred in finding Facebook to be a party to the communication between the subscriber and the first-party website. We use the examples in the briefing of CNN.com. We also use the examples of Walmart.com. Those are in the complaint and in the briefing. But Facebook is not a party to that conversation. It's not argued in this case. Instead, what the district court found in the decision dismissing the Second Amendment complaint, the district court reversed itself, originally finding that Facebook was not a party to the communication. The second order found that it was. And this would be the conversation supposedly occurring between the user's browser and Facebook. So the conversation between the subscriber and the first-party website consists of a series of exchanges of URLs. That's how computers communicate. The first one would be a get request, dear server, please send me information. Then there's the post response, and that information comes back. That conversation, Facebook is not a party to. It is intercepted in real time. It's repackaged as a referrer header, put into a cookie. It's then coupled with user identifiable. So there's a circuit split on this issue, right? There is. I can say that there is an unfortunate split. So explain to me why you think we should follow the First and Seventh Circuit. I believe that if we, in the Internet age, were to consider interceptors to be parties to the communication between the victim and the interceptor, because the previous conversation or the concurrent conversation going on elsewhere is somehow redirected and sent off to the interceptor, that would eviscerate the eCPA. When the purpose of the eCPA was to update the old Wiretap Act, the law that applied to surveillance of telephone conversations over wires and update it for the computer age. When, in fact, this new reading of the party to communication exception would completely gut the eCPA. It would give license to all interceptors to design their interceptions in ways that would work around this actual case. It is not the case, say it's 1969 or 1970, where someone takes a bug, puts it on the phone, overhears your conversation, and then that bug, a separate device, is then transmitting a copy of the conversation in real time. Instead, in the Internet age, the browsers and other devices of the users are being commandeered like zombies and being told, instructed with code, send a copy of this communication in real time to the interceptor. So there's not a separate listening device. It's not like Facebook goes into everybody's home and puts a separate device onto the computer. Instead, it is instructing your browser in real time to send copies of those communications. If we then deem Facebook to be a party to the other conversation simply because they commandeered someone else's computer, then we cannot enforce the eCPA when it comes to electronic communications, even though that was the purpose of updating the Wiretap Act with the eCPA. So for that public policy reason, we believe that is the correct reading. It also, there was a slightly different reading that the district court had in its first order on the first motion to dismiss, rejecting Facebook's argument. There was the question of knowledge. Is the user actually aware that Facebook is receiving real-time copies of these communications? And the district court originally objected to the defense saying, but there's no way that these users are aware that Facebook is also receiving copies, especially when if one were to read the privacy policy closely, Facebook said it wasn't. And this is also the position that Facebook and a lot of companies in the tech community took recently in an amicus brief filed with the United States Supreme Court. That's in the U.S. versus Councilman. The majority agreed with the position taken by Facebook there, which is that we must respect privacy even though and, in fact, because modern technology is forcing these communications to be repackaged and sent without the knowledge or consent of the average user. It's because the way technology has developed that these things are occurring in the background necessarily that we need to understand the technology and understand either Fourth Amendment or eCPA or any other statute in light of reality. Facebook was right in that amicus brief, and that logic should be applied here. You're down to about a minute. I did reserve some time. Should I sit down? Yes. Thank you. May it please the Court, Lauren Goldman of Mayor Brown for Appleby Facebook. I want to start out by setting the record straight on something very important. Plaintiff's reply brief abandons their contract claim and abandons the theory that there was any promise here not to receive information about the browsing habits of logged-out users. Plaintiffs came in in their opening brief, and they say Facebook promised starting in 2010 that it would not be tracking logged-out users. We came back, and we said, no, there is nothing in your complaint or your exhibits that identifies such a promise during the class period. Plaintiffs are very loosey-goosey about what they're citing in their brief, but a number of the exhibits that they cite in their brief are dated after the class period, after the period when they're saying Facebook was engaging in this conduct. They come back, they file their reply brief, they don't even mention this. Plaintiffs have given up on any argument that Facebook promised not to track logged-out users. Facebook never made that promise. So the premise of their argument that Facebook was deceiving people is groundless. It's not in the complaint. It's not in the attachments to their appellate brief. It's just something that they're saying. It's nothing that passes muster under Iqbal or Trombley. So there was nothing surreptitious about this. The privacy policy just didn't discuss it until later when the privacy policy did say we're not doing it because we weren't doing it. Now, I want to talk about standing here. The district court analyzed the standing issue after the Supreme Court had decided Spokio, but before this Court had construed Spokio. And what this Court has said over and over again in the cases since Spokio was decided is that to bring a federal case, you have to have an actual, real-world, concrete, non-abstract injury. So in cases like Bassett and Dutta and Jarrus and all the other cases that we cite in our brief, including Robbins on remand, this Court has said what happened to you? What was taken from you? What money did you lose? What intangible injury did you suffer? How were you made worse off by the conducted issue here? And that's something where the plaintiffs have really failed. They come in and they say, well, we might have had an economic injury. But as the Court pointed out, they don't allege that they could have sold their data, that they would have sold their data, or that their data is now worth less as a result of the alleged conduct here. Kennedy, I appreciate what you're saying, but let's take the privacy issue, as you know very well. Privacy is a common-law interest, and as was pointed out, at least in California, we have lots of statutes and there's some federal law as well that expressly refer to the common-law right of privacy. What's Facebook's response to the idea that when someone's privacy is invaded, as what occurred here, that there are no damages? Well, our position, Your Honor, is that their privacy was not invaded here. Because of the time period and you didn't make the promise, which you just said a minute ago, is that what you're saying? In part. But also in part because this Court and the California courts have recognized over and over again that the collection of basic digital data about people, the places that people go on the Internet, is not something in which people have a reasonable expectation of privacy, barring some promise not to collect that information. That's what makes this case different from cases like Google Cookie in the Third Place interest. Google said, if you want to activate your cookie blockers, we won't be able to get information about you via cookies. And Google was surreptitiously, allegedly in that case, Google was surreptitiously using software that overrode the cookie blockers. I want to be sure. I know you focused this in terms of the class period, but I want to be sure I understand your position. When the Australian, I think it was, discovered that Google, or rather Facebook, was continuing to monitor people after they had gone offline, you're saying that they have waived any argument about that because it's not during the class period? What's your argument on that? Let me take a step back, Your Honor. It's not a waiver issue. The issue is this. The plaintiffs claim that Facebook was collecting information about logged out users between April of 2010 and September 26, 2011. During that time, there was no promise not to do that. There was no statement by Facebook one way or the other about what it was doing. So the contract, effectively almost all these contracts are contracts of adhesion. But putting that aside for a moment, you're saying if you looked in the contract, there was just nothing about it one way or another? There was nothing about logged out users, no. Okay. Was there anything about when you are online, we collect this information? Not in the contract. The help center said when you are online, we get your user ID. Okay. So the negative pregnant of that is the opposite. But that wasn't in the contract. That was only in the help center. Okay. And the district court correctly found that the help center was not incorporated by reference into a contract. So these alleged promises that when plaintiffs say Facebook said we're not getting your user ID when you're logged out, that statement was dated after September 26, 2011, which is the date on which plaintiffs say in their complaint Facebook fixed the problem. So they're saying you fixed the problem on September 26th, and on September 27th you said we're not doing this. That's their argument. It's not about waiver. It's about facts. It's about what they allege we promised and when we promised it. But when you're talking about the tort, the invasion of privacy. Yes, Your Honor. And the reasonable expectations of privacy, why isn't there a factual question as to the existence of tracking when you're logged out of Facebook? Why doesn't that present a tribal issue effect? Because the Court already decided in Forrester and in Zynga that there is no reasonable expectation of privacy in the locations that you visit on the Internet, and that's for two reasons, Your Honor. The first reason is that people don't have – people are giving out this information. When you go places on the Internet and you, you know, you type an URL into your browser, people use cookies and they know where you're going. And the Court said in Forrester and reaffirmed in Zynga that people don't have a privacy interest in that. That's not a question of fact. Now, but it's slightly different in this case because you are tracking where they're going when they're not using your program. I understand the browser theory and so forth, but this – isn't this slightly different when you're tracking information after they've logged out of Facebook? No, Your Honor, because what you're still receiving is URLs, locations on the Internet. You're not receiving – this takes me to the second reason why they don't have a reasonable expectation of privacy. California law recognizes a privacy interest only in information that is sensitive and personal. That's what the California Supreme Court said in Hill. And in Hill, the California Supreme Court also said this is a question of law for the Court. So what the Court said is that California law recognizes a privacy interest in things that are sensitive and private. The plaintiffs here don't even say what websites they went to. They don't say, as Your Honor, Judge Smith pointed out, they don't say that they had different browsing habits when they were logged out versus logged in. They don't say anything at all about these URLs. So – But let's just say hypothetically that they had alleged that they had information that the people who went offline did so so they could secretly go to a porno site or something like that and this was a minister or something like that or a group of ministers. Would that make any difference? It might be a closer case because they would have to show what information, where they went, why that was sensitive, why they were harmed by Facebook's receipt of that information. In our view, they would also have to show that that information was disclosed to third parties, that Facebook sold it, as the defendant did in the Eichenberger case, that the defendant – that it was used to embarrass them. They have to allege real-world harm, that something happened to them, that they were embarrassed, that they were shown to be doing something that they shouldn't have been doing. If you say I went to – I logged out of Facebook intentionally and then I went to www.porno.com, Facebook received that information, they posted it, my wife found out and she divorced me, that would be a very different thing. But I want to point the Court to the specific allegations that they make about the named plaintiffs in this action, which appear at pages 1101 and 1102 of the record. All they allege is that each named plaintiff visited unidentified websites when they were logged out of Facebook and that Facebook received that information. That's not a harm. It's not a harm as a matter of law under this Court's decisions in Zinga and in Forrester. It's not a matter of – it's not – it's not harm under California law. Would there be – would there be a commonality issue in addition to that? So everybody's secret stuff would maybe be different. Would that make any difference? Well, it would make a difference in terms of class certification, which I assume is why they haven't put it that way. Yes, you would have individual questions about standing. But this case didn't get that far. I mean, so essentially what the plaintiffs are doing is you read the complaint and all you know is that each plaintiff went to one or two websites. They could be checking weather.com to get the forecast from Milwaukee. And if somebody comes into Federal court and says Facebook found out that I checked the weather forecast in Milwaukee, that's not a Federal claim. That's not private information under California law. Facebook's receipt of it didn't harm anybody. And it doesn't matter whether it's a statutory claim or a common law claim. And the reason for that is that as this Court explained in the Bassett case in, I think it was footnote 2, the Court said whether it's a statute or not a statute, we still have to look at whether there was a harm. You can't get into Federal court without a harm. And a harm has to be something that happened to you in the real world, I was worse off, and here's why. I wanted to talk a minute – if the Court has further questions on standing, Your time's running down, so if you have some other topics you want to address. Okay. I just wanted to talk a little bit about the Wiretap Act, because this is a criminal statute, and it's designed to prevent wiretapping. And there's multiple reasons why the plaintiffs have not alleged a wiretap here. But I wanted to talk about the circuit split, which Your Honor asked about. This Court has already taken sides on that split in the Conop case. In Conop, this Court held that it's not an interception under the Wiretap Act unless you stop, seize, or interrupt something in progress or in course. You can't stop, seize, or interrupt in progress or in course something that is coming directly from the plaintiff's browser to you. So this Court has already taken sides on that. But even were that not so – This precise issue wasn't argued in that case. No, but the Court was considering the word intercept under the Wiretap Act. So we would posit that that's binding. But even if it weren't, I want to talk about the First Circuit case and the Seventh Circuit case, and I want to talk about Google Cookie. So the Wiretap Act has a specific exception for a party. It says it's not unlawful for a party to intercept a communication. In Google Cookie, the Court was dealing with the exact matters at issue here, not with respect to the promises that were made to the users, but with respect to how GET requests work. And the Court said, look, all of these communications went directly from the plaintiff's browsers to Google. And so as a result of that, Google was a party to all of the communications it obtained. That party exception was not at issue in either the First Circuit's decision in PharmaTrack, which contained almost no reasoning, or the Seventh Circuit's decision in the Simkowich case, which was a criminal case where the defendant was accused of having rearranged his boss's browser so that all of her emails went directly to him. And the Court said, look, that's an interception any way you look at it. But the Court also was not dealing with the party exception. So to the extent the Court thinks that there's any room here after CONOP, we would urge the Court to follow Google Cookie, which is addressing this same situation, is much more recent, and addresses the party exception. I also want to point out, though, that there would be no reason to get to that, even if plaintiffs meet standing, which we don't see how they can. There wouldn't be any reason to get to it, because under this Court's decisions in Forrester and Zynga, nothing that was allegedly received here was content. In Forrester, the Court said the URL about where somebody went on the Internet is not the content of a communication. It's routing information. And, A, you have no reasonable expectation of privacy in it, and, B, it's not content. In Zynga, the Court said, we agree with that. We're applying it to the Wiretap Act. We think URLs are not content. There's a bit of dictum in Zynga where the Court said, well, maybe if there's search terms, that might tell you a little more about the substance of what somebody was doing on the Internet, but no search terms are alleged here. So that's not an issue. So there's really no reason for the Court to wade into any circuit split, because as the district court correctly held, there was no content here. We would submit that plaintiffs' contract claims have now been abandoned, because they have abandoned any attempt to show that there was any sort of promise, enforceable or non-enforceable, not to track logged-out users during the class period, which is the period of time when they say we were doing this. They also have not alleged damages, and they haven't alleged that there were — that there was any promise that was actually incorporated into Facebook's content. Roberts. Before you sit down, would you address the theory of unjust enrichment? Oh, sure, Your Honor. Absolutely. So the problem with that theory is that there's — unjust enrichment is a theory of damages. It's not a theory of injury. There's a difference between injury and damages. Injury is this happened to me, and it was a problem, and here's why I was injured. Damages is the measure of relief for that injury. Plaintiffs are saying that they should be able to recover on an unjust enrichment theory. Now, they have several problems with that. One is that they never pled unjust enrichment damages because they're not available for their causes of action. But the bigger problem is that you can't allege an injury by saying somebody else profited. Even before Spokio, courts in this circuit said you can't satisfy standing by saying the defendant profited from my data. You have to show that I was worse off. And in fact, Plaintiff's amicus brief makes this very point. They say unjust enrichment allows a damages theory where the defendant — where the plaintiff can show that the defendant profited from his property at the plaintiff's expense. That's what the restatement says. That's what their amicus Professor Lakehawk says. There's no allegation of expense here, as the Court pointed out. And in any event, even if damages were theoretically available under California law in this theory, which they don't appear to be, that still would not help plaintiffs get past the hard floor of Article III jurisdiction. They still haven't shown an injury. Just very quickly, one last point on this. The Leap case that the plaintiffs rely on heavily in their reply brief is an excellent example of this. The plaintiff there said that her identity was stolen. The thief bought property with her identity, and then the thief disappeared. The property appreciated, and she said, I should be entitled to the appreciation because I suffered the serious consequences of identity theft. The Court said, yes, you're right. You suffered serious consequences, and so the measure of damages is the appreciated property. That's how unjust enrichment works. It's the measure of damages once you've shown you've been injured, which the plaintiffs have not done here. Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honors. I'll be quick on rebuttal. A couple of points. Regarding URLs, whether URLs contain contents, the argument that Facebook is advancing is the exact argument that was advanced by the NSA in the now partially declassified FISA Court order that we included with our request for judicial notice. There, the NSA argued that URLs are merely addressing writing information and not contents. That was rejected by the FISA Court. URLs can contain contents, obviously, when they have search terms, but also when they contain similar communications, not just search terms, as this Court said in Zynga. In paragraph 185 of the Second Amended Complaint, we did actually allege that search terms were in the URLs that were intercepted, if that's important to the Court. That was actually alleged, but our theory here is broader than that, that URLs beyond the mere IP addresses, and we can see that a mere IP address might be just routing information, but the full file path, the full URL, would be content. There's a nice discussion of that in at least the parts that are declassified in the FISA Court order and other litigation. Counsel, I want your answer to this question. Opposing counsel indicated that you had abandoned the promise not to take info without consent. What's your response to that? No, we did not abandon it. Obviously, our primary claims here are the privacy claims and the wiretap claims, the lack of consent to take the information. But in addition, we have the contract claims at the end. They are still alive. The reason I believe that the question is whether they're abandoned is because they weren't addressed in the reply brief because there was nothing new to say. Our Third Amended Complaint does the best job. Was it raised at some other point in your opening? Yes, in the opening brief, Your Honor. And of course, it's pled with particularity in the Third Amended Complaint, paragraphs 57, 62, 65, and 66. These are a number of very clear public representations Facebook made saying we will not track you post-logout. Whether or not that qualifies as a contractual promise not to do so is relevant for the contract claim. But it's not relevant for any other claim because there wasn't... Oh, the Help Center, I think she called it. That's enough from your perspective? Absolutely. So, for example, Facebook says in its Help Center, because you're not logged into Facebook, we don't receive your user ID. That's in paragraph 65 of the Third Amended Complaint. In paragraph 66, Facebook says Facebook cannot track your actions on external sites unless you decide to connect your Facebook account to that site, and so on. They're in the Third Amended Complaint. These are representations that are made during the class period, not at the end, as you just heard. If they are not contractually binding as a promise not to track post-logout, they are certainly a representation. And that was sufficient for the Third Circuit in the Nickelodeon Viacom case and sufficient in the Google case. There is no contract claim in Google cookie placement. There's no contract claim in Viacom Nickelodeon because there was no contract. It was merely a representation in pages very similar to the Help Center pages here. Facebook made it very clear that they were not tracking post-logout. When that became public, it was the biggest privacy scandal of the day. It only eclipsed recently with the Cambridge Analytical scandal. The FTC investigated a record 20 years of privacy audits. Congress investigated. The tech press went nuts. This was a very clear time. You're over your time. Yes. Thank you very much for your time. Thank you, counsel. The case has started to be submitted for decision.
judges: Thomas, M. Smith, Vratil